

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BARBARA HEIDEGGER, and EM-TEES, INC.  )
                                          )
      Plaintiffs,                    )
                                         )
      v.                              )

CITY OF CHICAGO, CHICAGO POLICE )
OFFICERS ERIC OLSEN, Star #19456, )
GREGORY INSLEY, Star #14260, FRANK )
VILLAREAL, Star #10438, JEROME FINNEGAN, )
Star #5167, CARL SUCHOCKI, Star #18391, )
JAMES ELDRIDGE, Star #2081, JOHN BLAKE, )
Star #454, B. CORCORAN, Star #17069, )
J. HURLEY, STAR #17516, B. MAKA, Star )
#12206, G. SALINAS, Star #10293, B. RICE, Star )
#16059, OFFICER HANDZEL, Star #8116, )
OFFICER MARKIEWICZ, Star #17092, )
OFFICER FERGUSON, Star #14213, OFFICER )
NELLIGAN, Star #8953, OFFICER HARVEY, )
Star #9165, OFFICER MCGOVERN, Star #18856, )
OFFICER CASE, Star #1753, OFFICER )
CONNELLY, Star #16869, OFFICER FOLEY, )
Star #10613, SUPERINTENDANT PHILIP )
CLINE, DEBRA KIRBY, MAYOR RICHARD )
DALEY, and UNKNOWN CHICAGO POLICE )
OFFICERS. )
                                         )
      Defendants.                   )

07CV 5738
JUDGE BUCKLO
MAGISTRATE JUDGE BROWN

**FILED**

OCT 1 0 2007   NF.
10-10-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JURY DEMANDED

## COMPLAINT

NOW COME the plaintiffs, BARBARA HEIDEGGER and EM-TEES, INC. through

their attorneys, A LAW OFFICE OF CHRISTOPHER R. SMITH, Jared S. Kosoglad and

Christopher R. Smith, and for their Complaint against defendants CITY OF CHICAGO,

CHICAGO POLICE OFFICERS ERIC OLSEN, Star #19456, GREGORY INSLEY, Star #14260, FRANK VILLAREAL, Star #10438, JEROME FINNEGAN, Star #5167, CARL SUCHOCKI, Star #18391, JAMES ELDRIDGE, Star #2081, JOHN BLAKE, Star #454, B. CORCORAN, Star #17069, J. HURLEY, STAR #17516, B. MAKA, Star #12206, G. SALINAS, Star #10293,B. RICE, Star #16059, OFFICER HANDZEL, Star #8116, OFFICER MARKIEWICZ, Star #17092, OFFICER FERGUSON, Star #14213,OFFICER NELLIGAN, Star #8953, OFFICER HARVEY, Star #9165, OFFICER MCGOVERN, Star #18856, OFFICER CASE, Star #1753, OFFICER CONNELLY, Star #16869, OFFICER FOLEY, Star #10613 SUPERINTENDANT PHILIP CLINE, DEBRA KIRBY, MAYOR RICHARD DALEY and UNKNOWN CHICAGO POLICE OFFICERS, state as follows:

## INTRODUCTION

1.     This is a civil action seeking damages against defendants for (1) conducting affairs of various enterprises, including the City of Chicago, Chicago Police Department, and Special Operations Section, through a pattern of racketeering activity against the plaintiffs; (2) against defendant City of Chicago for maintaining widespread policies and practices in furtherance of the racketeering; (3) for depriving plaintiffs of rights guaranteed by the U.S. Constitution; and (4) for related State law claims.

## JURISDICTION

2.     This action is brought pursuant to 18 U.S.C. §§ 1961, *et. seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and pursuant to 42 U.S.C. §§ 1983, 1985, and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  The

jurisdiction of this Court is also invoked pursuant to the Civil Rights Act, 42 U.S.C., § 1983, and § 1985; the judicial code 28 U.S.C., § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction as provided under U.S.C., § 1367(a). Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising out of state law.

## PARTIES

3.      Plaintiff Barbara Heidegger is a U.S. citizen who currently resides in Chicago, Illinois.

4.      Plaintiff Em-Tees, Inc. is an Illinois corporation in good-standing, owned and operated by Barbara Heidegger. Em-Tees, Inc. operates several businesses including Caballo, a bar, on 3748 West 63rd St., Chicago, IL, 60629.

5.      Defendant Chicago Police Officers Jerome Finnegan, Star #5167, John Blake, Star #454, James Eldridge, Star #2081, Frank Villareal, Star #10438, Carl Suchocki, Star #18391, Officer McGovern, Star #18856, Eric Olsen, Star #19456, Gregory Insley, Star #14260, B. Corcoran, Star #17069, J. Hurley, Star #17516, B. Maka, Star #12206, G. Salinas, Star #10293, B. Rice, Star #16059, Officer Handzel, Star #8116, Officer Markiewicz, Star #17092, Officer Ferguson, Star #14213, Officer Nelligan, Star #8953, Officer Harvey, Star #9165, Officer Case, Star #1753, Officer Connelly, Star #16869, Officer Foley, Star #10613, and Unknown Chicago Police Officers, collectively the "Officer Defendants," were, at the time of this occurrence, duly licensed Chicago Police Officers. They engaged in the conduct complained of while on duty in the course and scope of their employment and under color of law. They are sued

3

in their individual capacities.

6.     Defendant City of Chicago, ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of all other defendants. At all times relevant hereto, all defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the State of Illinois and the City of Chicago, and within the scope of their employment with defendant institutions.

7.     Defendant Philip Cline was the Superintendent of the Chicago Police Department beginning in August 2003. Philip Cline resigned in April 2007. As Superintendent, Cline was responsible for the overall management of the Chicago Police Department. At all times material to this complaint, Cline acted in the course and within the scope of his employment. Cline is sued in his official capacity.

8.     Debra Kirby is the Assistant Deputy Superintendent that heads the Internal Affairs Division of The Chicago Police Department, and has been during all times relevant to this complaint. At all times material to this complaint, Kirby acted in the course and within the scope of her employment. Kirby is sued in her official capacity.

9.     Mayor Richard Daley is the mayor of the City of Chicago, and has been at all times relevant to this complaint. Richard Daley is the highest level executive and policymaker for defendant "City", and is responsible for faithful execution of Chicago's statutes and laws. Mayor Richard Daley is sued in his official capacity.

## FACTS RELATED TO THE OFFICER DEFENDANTS

10.     On March 27, 2004, at 12:30 a.m., the Officer Defendants, numbering over 25,

4

surged through the front door of Caballos, a bar operated by Em-Tees Inc., and owned by Barbara Heidegger. Within seconds the Defendant Officers packed the crowded bar.

11.     A deterrent security monitor sat in plain view, and Defendant Jerome Finnigan turned the monitor's power off.

12.     Defendant Jerome Finnigan, an SOS officer, explained to Caballo staff that the officer defendants were searching for drugs and guns and that the search was a routine event.

13.     Unknown defendant officers kept watch from outside, forbidding patrons from entering and preventing patrons from leaving.

14.     Unknown defendant officers, searched bar patrons, one after another, without any legal justification.

15.     Unknown defendant officers searched the pockets of almost all of the bar patrons, without any legal justification.

16.     Unknown defendant officers opened the wallets of bar patrons, without any legal justification.

17.     Defendant officers arrested two men and one woman, and led them outside of the bar.

18.     Defendant Officers intimidated the bar patrons.

19.     Defendant Officers searched all areas of the bar.

20.     Unknown defendant officers removed U.S. currency from the pockets of bar patrons, which U.S. currency was never inventoried or accounted for by the defendant officers.

21.     Unknown defendant officers searched the vehicles of bar patrons.

5

22. Unknown defendant officers removed property from the vehicles of bar patrons, which property was never inventoried or accounted for by the defendant officers.

23. After occupying the bar for approximately a half-hour, defendant officers started to leave.

24. Unknown defendant officers visited a second liquor establishment and conducted searches similar to those conducted at Caballo's. Said officers visited the second liquor establishment with a man taken into custody at Caballo's, Jose Reyes.

25. Unknown defendant officers, with Jose Reyes in custody, went to Mr. Reyes' home.

26. Unknown defendant officers, without any legal justification, entered the home of Mr. Reyes, where his wife and children were asleep.

27. Unknown defendant officers, without any legal justification, removed personal property from the home of Jose Reyes, which property was never inventoried or accounted for by the defendant officers.

28. Unknown defendant officers visited a food establishment with a man taken into custody, Gregorio Martinez (AKA "Raymundo Martinez"). Unknown defendant officers used U.S. currency taken from customers at Caballo's, including Mr. Martinez, to purchase food and drink for themselves, while Mr. Martinez was in their custody.

29. Unknown defendant officers, while at Caballo's and without any legal justification, took Laura Diaz into custody because she was pretty.

30. Unknown defendant officers released Ms. Diaz from custody at the police station.

6

31.     As a direct and proximate result of the illegal searches and seizures performed by the defendant officers at Caballo's, the patrons left, which caused damage to plaintiffs.

32.     As a direct and proximate result of the racketeering and illegal searches and seizures performed by the defendant officers at Caballo's, Em-Tees, Inc. lost a substantial amount of business the night of March 27, 2004, and business at Caballo's slowed considerably in the months that followed the raid.

33.     Before and after the March 27, 2004 raid at Caballo's, unknown Chicago Police officers conducted various raids, similar to the March 27, 2004 raid at Caballo's, at liqour establishments owned by Em-Tees, Inc. and at liquor establishments throughout the Chicago area. The latest raid took place as recently as December, 2006.

## Conspiratorial Activities

34.     After one of Mr. Martinez' arresting officers testified under oath at the criminal hearing of Gregorio Martinez, Mr. Martinez' criminal attorney gave Cook County prosecutors a copy of the Caballo surveillance tapes that unequivocally proved that the defendant arresting officer had perjured himself.

35.     Cook County prosecutors continued to rely on the sworn testimony of officers known to have perjured themselves.

36.     Cook County prosecutors provided the Internal Affairs Division a copy of the Caballo surveillance tapes in 2004.

37.     IAD never investigated the tapes and never recommended criminal charges against the officers in the tapes.

7

38.     Defendant Cline, in concert with First Deputy Dana Starks, other Assistant Deputy Superintendents, Chiefs and their deputies, defendant Debra Kirby, and other high ranking supervisory staff obstructed the efforts of federal, state, and local law enforcement to end the City of Chicago's racketeering enterprise.

39.     All of the named defendants committed acts in furtherance of the conspiracy alleged in this case between 2002 and 2006, at a minimum. The City of Chicago's racketeering enterprise included several hundred overt acts in furtherance of its criminal conspiracy.

40.     Even in 2007 defendant Jerome Finnigan attempted to murder police officers to protect the City of Chicago's racketeering enterprise and the associated conspiracy to shield the racketeering enterprise from public view.

### Racketeering Activities

41.     The Special Operations Section of CPD, which includes several defendants in this action, committed hundreds of racketeering predicates between 2002 and 2007, including but not limited to kidnapping, robbery, extortion, dealing controlled substances, obstruction of justice, obstruction of Federal, State, and local law enforcement, obstruction of criminal investigations, intimidation of witnesses, retaliation against witnesses, interference with commerce by threats and violence, influencing, delaying, and preventing testimony, and hindering, delaying, and preventing the communication of federal offenses to law enforcement agencies and judicial officers.

42.     The most common method of the defendants' racketeering scheme began with a kidnapping, wherein defendants targeted a victim on the basis of race, socioeconomic status,

8

and/or criminal history. Defendants used their badges and weapons to handcuff a victim often without any legal justification.

43.    Once the victim was handcuffed, the defendants often stole U.S. currency and any other valuable personal effects from that victim. The defendants, holding their victim under the threat of gunpoint, would further demand drugs and guns in an effort to locate and steal U.S. currency.

44.    If the victim claimed ignorance or otherwise did not cooperate in the robbery, defendants used physical force, rising to the level of torture in some instances, to compel information.

45.    The defendants would then proceed to the victim's home and without any legal justification would enter that home with their guns drawn. Defendants would indiscriminately point their weapons at victim's spouses, children, infants, and any other person present for the home invasion and robbery. Defendants would search the home, rob its occupants of valuable possessions and U.S. currency, and charge the victim with often unwarranted criminal offenses, most commonly possession of a controlled substance or possession of a firearm.

46.    In furtherance of their racketeering enterprise, defendants would obtain quantities of controlled substances, often obtained through other drug arrests, and other firearms to threaten and plant against their victims.

47.    Defendants often testified at the criminal trials of their victims, locking them behind bars to discredit any claims of robbery, torture, or other crimes, by the victim.

48.    Supervisory SOS personnel, including but not limited to defendants named herein,

trained officers in organized criminal methods and tactics to aid the commission of the crimes described throughout this Complaint and taught officers how to avoid detection and punishment for serious felonies.

49.     In the event a racketeering officer became the subject of possible detection, the Supervisory Defendants, including Cline, Kirby, and Dana Starks, pursuant to the below described City of Chicago racketeering policies, rejected and conspired to reject claims found valid by IAD or OPS.

50.     The City of Chicago and Mayor Richard Daley employ overt policies and practices in furtherance of the City of Chicago's racketeering enterprise.

51.     The City of Chicago never investigates and dismisses any and all complaints of misconduct against police officers unless the complainant makes a sworn statement. Even when providing a sworn statement is impracticable, such as when criminal charges remain pending against the complainant, the City of Chicago dismisses the complaint. The City of Chicago's deliberate failure in this regard has the effect of encouraging police officers to employ unlawful means to achieve unlawful purposes.

52.     The City of Chicago fails to investigate criminal offenses committed by police officers. The City of Chicago performs no criminal investigation into the crimes of police officers. The City of Chicago's failure in this regard is a deliberate and intelligent choice made by its policy makers to shield police misconduct from public scrutiny. The City of Chicago's deliberate failure in this regard has the effect of encouraging police officers to employ unlawful means to achieve unlawful purposes.

10

53.     The City of Chicago conceals material evidence of criminal conduct by police

officers. The City of Chicago's deliberate failure in this regard has the effect of encouraging

police officers to employ unlawful means to achieve unlawful purposes.

54.     The City of Chicago facilitates a policy of, "circling the wagons," wherein officers

accused of misconduct are given the opportunity to conspire with each other about criminal

conduct. The City of Chicago's deliberate failure in this regard has the effect of encouraging

police officers to employ unlawful means to achieve unlawful purposes.

55.     The City of Chicago maintains a strict, "code of silence," wherein officers lie and

commit perjury rather than report the criminal offenses of other officers. The City of Chicago's

deliberate failure in this regard has the effect of encouraging police officers to employ unlawful

means to achieve unlawful purposes.

56.     At all times relevant to this Complaint, the City of Chicago maintained a policy

and practice of permitting supervisory police officers to reject complaints of criminal conduct by

police officers without any explanation. The City of Chicago's deliberate failure in this regard

has the effect of encouraging police officers to employ unlawful means to achieve unlawful

purposes.

57.     In furtherance of the policy described in the above paragraph, Superintendent

Cline, Debra Kirby, Dana Starks, and other unknown coconspirators have a policy and practice of

conspiring to reject complaints of criminal conduct by police, which complaints were

investigated and sustained by IAD and OPS.

58.     The effect of the conspiracy described in the above paragraph was that IAD and

11

OPS investigators ceased investigating complaints of criminal conduct by police officers and ceased sustaining complaints of criminal conduct by police officers because such activities became futile.

59.     The City of Chicago's overt practices and policies described above are intended to prevent, hinder, and obstruct complaints against police officers without regard to their merit and in fact have such an effect.

60.     The City of Chicago's overt practices and policies described above obstructs investigations into criminal misconduct by police officers, obstructs justice, and obstructs the communication of criminal offenses by police officers to federal, state, and county authorities.

## Count I

**18 U.S.C. Section 1961 *et. seq.* – Racketeer Influenced and Corrupt Organizations**

1-60.     Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.     The racketeering enterprises in this cause of action are the City of Chicago, Chicago Police Department, and Special Operations Section thereof, in which the defendant officers and other officials used their official positions to illegally commit a pattern of racketeering activity, including but not limited to kidnapping, robbery, extortion, dealing controlled substances, obstruction of justice, obstruction of Federal, State, and local law enforcement, obstruction of criminal investigations, intimidation of witnesses, retaliation against witnesses, interference with commerce by threats and violence, influencing, delaying, and preventing testimony, and hindering, delaying, and preventing the communication of federal offenses to law enforcement agencies and judicial officers, as detailed more fully throughout this

12

Complaint.

62.     As detailed above, the individual defendants and other as of yet unknown officials and officers conducted and participated in the conduct of the City of Chicago, Chicago Police Department, and Special Operations Section through a pattern of racketeering activity, and conspired amongst themselves and others unnamed to do the same.

63.     As a direct and proximate result of the racketeering violations described above, plaintiffs were injured in their business and property, including but not limited to lost income in the past, present, and future and damage to the business' reputation.

64.     The police officer defendants are employed by and associated in fact with said enterprises, the City of Chicago, Chicago Police Department, and Special Operations Section.

65.     The individual defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, directly and indirectly, conducted and participated in the affairs of the City of Chicago, Chicago Police Department, and Special Operations Section, through a pattern of racketeering activity, as is described throughout this Complaint.

WHEREFORE, plaintiffs demand judgment against the city for compensatory damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and further demands judgment against the individual officers, jointly and severally, for treble damages in an amount in excess of FIFTEEN MILLION DOLLARS ($15,000,000.00), and further demands attorneys' fees and the costs of this action, and for such other and further relief as this Court deems just, proper, and equitable.

13

## Count II

### 42 U.S.C. Section 1983 Fourth Amendment Violations — Illegal Searches and Seizures

1-60.    Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.    The searches and seizure of Caballo and other Em-Tees, Inc. establishments, performed willfully and wantonly by the defendants, individually and in conspiracy with each other, were in violation of Barbara Heidegger's right to be free of unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States and 42 U.S.C. Section 1983.

62.    As a proximate result of the above-detailed actions of defendants, plaintiffs were injured, including the deprivation of their liberty and the taking of their property. The violations proximately caused Barbara Heidegger and Em-Tees, Inc. significant financial loss, exposed plaintiffs to public scandal and disgrace, caused damage to Barbara Heidegger's property, and caused plaintiffs to incur various expenses, all to their damage.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

### Count III

### 42 U.S.C. Section 1983—Due Process

1-60.   Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.   The Due Process rights of Barbara Heidegger and Em-Tees, Inc. were violated by the taking of their property and business, without being afforded due process of law.

62.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful inference to Plaintiff's constitutional rights.

63.   The misconduct described in this Count was undertaken under the policy and practice of the Chicago Police Department in the manner described above.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

### Count IV

### 42 U.S.C. Section 1983—Failure to Intervene

1-60.   Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.   As a result of their failure to intervene, supervisory defendants, policy defendants, and police officer defendants, sanctioned, encouraged, and participated in the violations of

15

plaintiffs' rights. Defendants had ample opportunity to intervene, and could have prevented the harm to plaintiffs and many others. Instead, defendants chose to pursue a course of deliberate indifference towards and directly supported the violations perpetrated by the Chicago Police Department. In this way, defendants helped to enforce the status quo of law enforcement apartheid that exists in many Chicago neighborhoods.

62.     As described in the preceding paragraphs, the conduct of the non-intervening defendants, acting under color of law and within the scope of their employment, violated federal statutes and the United States Constitution.

63.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful inference to Plaintiffs' constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

## Count V

### 42 U.S.C. Section 1983 - *Monell* Claim Against City of Chicago

1-60.   Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.   The constitutional violations detailed above were caused in a substantial capacity by

the customs, policies, and practices of the defendants, as promulgated, enforced, and

disseminated by the City of Chicago, the Mayor Richard Daley, the City Council, members of the

City Council, the aldermen, the Chicago Police Department, the Chicago Police Board, members

of the Chicago Police Board, the Office of Professional Standards, the Internal Affairs Division

of the Chicago Police Department, the State's Attorneys Office, Superintendent Cline, and

unknown Chicago policy makers whereby those charged with ensuring compliance with the

Constitution of the United States, in this case and many other cases, instead deliberately,

willfully, and wantonly encouraged the infliction of physical and psychological intimidation onto

the citizens of the City of Chicago in violation of the United States Constitution.

62. The customs, policies, and practices that caused the constitutional violations herein

alleged include:

(a) warrantless searches and seizures of minority citizens and their businesses;

(b) the denial of substantive due process, abuse of legal process, malicious prosecution,
    and filing of false charges against innocent persons by Chicago Police Officers;

(c) the filing of false and incomplete police reports to hide criminal and unconstitutional
    conduct by officers;

(d) a code of silence whereby officers refuse to report the unconstitutional and criminal
    misconduct of other officers, including the unconstitutional and criminal conduct
    alleged in this Complaint;

(e) a code of silence whereby officers remain silent or give false and misleading
    information during official investigations to cover up unconstitutional and criminal

17

misconduct, to protect themselves, and to protect other officers;

(f) Municipal policy-makers condone and facilitate this code of silence, through their official and unofficial policy, and regarding their bargaining posture vis-à-vis the Fraternal Order of Police.

(g) the willful, wanton, and deliberately indifferent failure to train, supervise, and discipline police officers in regards to unconstitutional and criminal misconduct;

(h) the willful, wanton, and deliberately indifferent failure to train, supervise, and discipline police officers in order to prevent unconstitutional and criminal misconduct by police officers.

(i) the failure to adequately investigate and substantiate allegations of unconstitutional and criminal misconduct by police officers;

(j) the failure to adequately discipline police officers that engage in unconstitutional and criminal misconduct;

(k) the encouragement and propagation of the misconduct complained of in subparagraphs (a)-(j) by stamping official approval on officers' unconstitutional and criminal misconduct through the Office of Professional Standards and IAD;

(l) the approval, support, and encouragement of unconstitutional and criminal misconduct by police officers to avoid financial loss;

(m) and the failure to deter police officers from engaging in unconstitutional and criminal misconduct by maintaining deficient, defective, and ineffectual investigatory and disciplinary procedures, as promulgated by the Office of Professional Standards.

18

63. The policies, practices, and customs herein complained of are so prevalent and widespread within the Chicago Police Department as to put City of Chicago policy makers on actual and implied notice that such policies existed in full force and effect.

64. Despite widespread and obvious patterns of police misconduct—conduct so prevalent that it has become de facto municipal policy, OPS and IAD make findings of wrongdoing in a disproportionately small number of cases.

65. As a matter of express policy, the City of Chicago refuses to consider patterns of misconduct allegations, when evaluating the merits of particular civilian complaints. OPS is forbidden by the City to take into account any officer civilian complaint history that does not rise to the level of sustained.

66. The Chicago Police Department does not include an evaluation of civilian complaint history in its performance evaluation and promotion processes. Police officers have little cause to fear that extensive patterns of alleged misconduct will hinder their professional advancement in any way—much less result in discipline.

67. City of Chicago policy makers acted willfully, wantonly, and deliberately indifferent towards the constitutional rights of plaintiffs by accepting, monitoring, maintaining, protecting, and encouraging the unconstitutional policies, practices, and customs listed in this Complaint.

68. By acting willfully, wantonly, and deliberately indifferent towards the constitutional rights of plaintiffs, City of Chicago policy makers approved, encouraged, and caused the constitutional violations alleged in this Complaint.

69. As a proximate result of the above-detailed actions of the defendants and City of

Chicago policy makers, plaintiffs were injured, including financial loss, injuries resultant from the above detailed constitutional violations, embarrassment, and other emotional injuries. In addition, the violations proximately caused the plaintiffs financial loss, exposed them to public scandal and disgrace, damaged their reputation, and caused them to incur various expenses, all to their damage.

WHERFORE, plaintiffs demand judgment against the defendants for compensatory damages in an amount in excess of FIVE MILLION ($5,000,000.00), plus attorney's fees pursuant to statute and the costs of this action, and such other and further relief as this Court deems just, proper, and equitable.

## Count VI

### 42 U.S.C. Section 1983—Equal Protection

1-60.    Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.    As a result of defendants actions, plaintiffs were denied equal protection of the law, as guaranteed by the United States Constitution.

62.    Specifically plaintiffs' businesses were singled out for unlawful treatment in a manner unlike similarly situated businesses in other parts of the city.

63.    There is no rational basis for the disparate treatments of plaintiffs' businesses and similarly situated businesses in other parts of the city.

64.    Plaintiffs businesses were further singled out for unlawful treatment because a large number of Latino patrons constitute its customers.

65.    There is no rational basis for the disparate treatment of plaintiffs' businesses and

20

similarly situated businesses in other parts of the city.

66.     The misconduct described in this Count was undertaken under the policy and practice of the Chicago Police Department in the manner described above.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

### Count VII

### Section 1985 — Conspiracy to Deny Equal Protection

1-60.    Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.     As detailed above, the defendants conspired and agreed among themselves to deprive Barbara Heidegger, and Em-Tees of their equal protection rights as guaranteed by the Constitution of the United States, and to obstruct justice.

62.     In so doing, the defendant officers were motivated in their violations of the rights of Barbara Heidegger and Em-Tees, Inc., by discriminatory-based racial animus towards the predominantly Latino patrons of Caballo.

63.     The City of Chicago and Chicago Police Department have a widespread policy and practice of singling out minority businesses for disparate treatment, whereas businesses in

21

predominantly Caucasion neighborhoods have never been the subject of similar police raids: not bars in Lincoln Park, not bars in Beverly, not bars in Bridgeport.

64.    As detailed above, the defendants committed overt acts in furtherance of the conspiracy.

65.    As a proximate result thereof, plaintiffs were damaged, including financial loss and damage to their reputation and occupation.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

### Count VIII

### 745 ILCS 10/9-102

1-60.    Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.    Defendant City of Chicago is the employer of all police officer defendants.

62.    The Officer Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, should any of the individual officers be found liable on one or more of the claims set forth above, Plaintiffs demand that, pursuant to 745 ILCS 10/9-102, the Defendant

City of Chicago be found liable for any judgment plaintiffs obtain against said defendants, as well as attorneys fees and costs awarded.

## Count IX

### Tortuous Interference with Business — State Claim

1-60.  Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

62.  Em-Tees, Inc., and Barbara Heidegger had an ongoing business relationship and the expectancy of future business with the patrons who lawfully gathered at Em-Tees, Inc. properties.

63.  Defendants knew that that properties operated by Em-Tees, Inc. were lawfully operated and maintained places of business.

64.  Defendants intentionally and maliciously interfered with the operation of plaintiffs' businesses and intimidated law abiding patrons.

65.    The City is sued in this Count pursuant to the doctrine of respondeat superior, in that defendant officers performed the actions complained of while on duty and in the employ of defendant City, and while acting within the scope of this employment.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiffs demand judgment against the Defendants, and other unknown Chicago Police Officers, jointly and severally, for compensatory damages against defendants officers in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), and because these defendants acted maliciously, wantonly, or oppressively, punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

23

## Count X

### Tresspass — State Claim

1-60.  Plaintiffs reallege paragraphs 1 through 60 above, as if fully set forth here.

61.  In the manner described more fully above, without any lawful justification, Defendants knowingly and intentionally intruded upon Plaintiffs' premises, in which they had possesssory interests.

62.  As a result of the Defendants' unjustified and unlawful trespass, Plaintiffs suffered injury, including financial loss and damage to their reputation.

WHEREFORE, plaintiffs Em-Tees, Inc. and Barbara Heidegger demand judgment against the defendants, jointly and severally, for compensatory damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00) and further demands judgment against the individual officers, jointly and severally, for punitive damages in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees pursuant to statute and the costs of this action and such other and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

By:  One of their attorneys

PLAINTIFF DEMANDS TRIAL BY JURY.

Jared S. Kosoglad
Christopher R. Smith
A Law Office of Christopher R. Smith
119 North Peoria, Suite 3A
Chicago, Illinois 60607
312-432-0400